IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIAM F. OSBORNE, | ) CASE NO. 1:19-CV-01708-JDG |
| Plaintiff, | ) |
| vs. | ) MAGISTRATE JUDGE<br>) JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) **MEMORANDUM OF OPINION AND** |
| Defendant, | ) **ORDER** |

Plaintiff William Osborne ("Plaintiff" or "Osborne") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED IN PART AND VACATED AND REMANDED IN PART for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In March 2008, Osborne filed applications for POD, DIB, and SSI alleging a disability onset date of April 30, 2003 and claiming he was disabled due to: seizure disorder; brain atrophy and cognitive deficits; depressive disorder; anxiety; insomnia; and chronic low back pain. (Transcript ("Tr.") at 93-94.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

The applications were denied initially and upon reconsideration, and Osborne requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 734.)

On September 28,2010, an ALJ held a hearing, during which Osborne, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 734, 14.) On October 13, 2010, the ALJ issued a written decision finding Osborne was not disabled. (*Id.* at 734.) The ALJ's decision became final on May 25, 2012, when the Appeals Council declined further review. (*Id.* at 734, 1-5.) Osborne challenged the ALJ's denial of benefits by filing a civil action in this Court. (*Id.* at 734.)

On March 28, 2011, Osborne protectively reapplied for SSI, alleging he had been disabled since October 14, 2010 – the day after the ALJ determined he was not disabled. (*Id.*) The application was denied initially and upon reconsideration, and Osborne requested a hearing before an ALJ. (*Id.*) On October 23, 2012, ALJ Kendra S. Kleber held a hearing, during which Osborne, represented by counsel, and an impartial VE testified. (*Id.* at 561, 734.) On January 4, 2013, ALJ Kleber found Osborne had been disabled since March 28, 2011, the date of his protectively refiled SSI application. (*Id.* at 734.)

On September 17, 2013, the Court vacated the ALJ's determination that Osborne had not been disabled through October 13, 2010. (*Id.*) The Court determined the ALJ "erred by limiting the claimant in part to 'simple, routine, and repetitive' and failing 'to include that limitation in his hypothetical question to the Vocational Expert, an error that means the Commissioner's decision is not supported by substantial evidence of record." (*Id.*) The Court also determined "it was 'unclear how a limitation of occasional supervision fairly described Osborne's limitations in concentration, persistence and pace' . . . 'Thus, on remand, the ALJ should provide further explanation as to how he accounted in the RFC for his findings of moderate limitations in concentration, persistence and pace, or alternatively, explain why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary.'" (*Id.* at 735.)

On January 23, 2014, the Appeals Council affirmed Judge Kleber's decision that Osborne had been disabled since March 28, 2011; therefore, the issue needing to be decided at the hearing level was "whether Osborne was disabled at any time between April 30, 2003, the date he has alleged he became disabled on, and March 27, 2011." (*Id.*)

On July 23, 2014, an ALJ held a hearing, during which Osborne, represented by counsel, and an impartial VE testified. (*Id.*) On September 26, 2014, the ALJ issued a written decision finding Osborne was not disabled between April 30, 2003, and March 27, 2011. (*Id.*) The ALJ's decision became final on September 4, 2015, when the Appeals Council declined further review. (*Id.*) Osborne challenged the ALJ's denial of benefits by filing a civil action in this Court. (*Id.*)

On March 6, 2017, the Court vacated the September 26, 2014 decision, finding as follows:

> Judge Round never explained "how he accounted in [the] RFC for his findings of moderate limitations on concentration, persistence *and* pace." ALJ Round and ALJ Ehrman's decisions each suffer the same hole: neither establishes how their respective RFCs account for Osborne's limited concentration, persistence and pace. Each decision lists medical professionals' findings regarding Osborne's concentration, persistence, and pace, but neither decision uses those findings to explicitly account for concentration, persistence, and pace in its RFC recommendation.
>
> This error is not harmless.
>
> On one hand, the error seems formalistic. In his original decision, ALJ Ehrman wrote "Thus, the RFC accounts for the claimant's limitation with focusing and concentrating by requiring occasional supervision." Perhaps Ehrman could have avoided Magistrate Burke's original remand if he had added *persistence and pace* to that sentence as well as a few lines of analysis. Likewise, ALJ Round's decision would probably have complied with the remand if he spent a few sentences explicitly connecting the medical professionals' findings on Osborne's concentration, persistence, and pace with his RFC recommendation.
>
> On the other hand, thorough consideration of Plaintiff Osborne's concentration, persistence, and pace capabilities could be outcome determinative. The extensive record indicates that this is a close case. After connecting Osborne's concentration, persistence, and pace limitations to his RFC, an ALJ could conclude that Osborne could not work from April 30, 2003 through March 27, 2011.

> Therefore, this Court remands this case back to the ALJ with the same instructions Magistrate Burke gave: The ALJ should provide further explanation as to how he accounted in the RFC for his findings of moderate limitations in concentration, persistence and pace, or alternatively, explain why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary.

(*Id.* at 902-03) (emphasis in original) (footnotes omitted).

The Appeals Council returned Osborne's case to the hearing level on July 21, 2017, randomly reassigning the case to another ALJ as Judge Round had retired before the Court's March 6, 2017 remand. (*Id.* at 736.)

On April 3, 2018, an ALJ held a hearing, during which Osborne, represented by counsel, and an impartial VE testified. (*Id.*) On May 10, 2018, the ALJ issued a written decision finding Osborne was not disabled between April 3, 2003, and March 27, 2011. (*Id.* at 734-60.) The ALJ's decision became final on May 28, 2019, when the Appeals Council declined further review. (*Id.* at 724-30.)

On July 27, 2019, Osborne filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 13, 14.) Osborne asserts the following assignments of error:

(1) The [ALJ] failed to adequately explain how the mental residual functional capacity reflects a "moderate" limitation in concentration, persistence and pace, where despite enumerating multiple "facts," she fails to provide a nexus between these facts and the residual functional capacity, especially where the "facts" are a cherry-picked version of the record.

(2) The ALJ failed to give "good" reasons for the weight assigned to treating psychologist Dr. Ahn's opinions, in violation of Social Security's own regulations and Sixth Circuit law.

(Doc. No. 11 at 16, 21.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Osborne was born in April 1969 and was forty-one (41) years-old on March 27, 2011 (the last date of the period at issue) (Tr. 501, 736, 758), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has a limited education and is able to communicate in English.  (Tr. 758.)  He has past relevant work as a CNC machinist.  (*Id.*)

### B.    Relevant Medical Evidence[2]

Osborne underwent individual counseling for his mental impairments from June 2004 to August 2004.  (*Id.* at 663-66.)  His goals included experiencing a "less depressed/irritable mood" and having "no thoughts of harming self or others."  (*Id.* at 666.)  At a session in July 2004, Osborne was cooperative, oriented in all spheres, exhibited an appropriate affect/mood, and reported no thoughts or plans of hurting himself or others.  (*Id.* at 665.)  Osborne complained of sleep disturbance and low energy.  (*Id.*)  Osborne discussed an incident with his brother, mother, and wife that got violent.  (*Id.*)  At a session in August 2004, Osborne again was cooperative, oriented in all spheres, exhibited an appropriate affect/mood, and reported no thoughts or plans of hurting himself or others.  (*Id.* at 664.)  Osborne complained of sleep disturbance, libido disturbance, and low energy.  (*Id.*)  In the treatment notes, Osborne's therapist stated Osborne's "mood was aggravated due to situational stress in the family home." (*Id.*)

On May 8, 2007, Osborne underwent a consultative examination for the Agency with Deborah Koricke, Ph.D.  (*Id.* at 218.)  Osborne reported he and his wife and gone to counseling a few years before, but he was no longer in treatment.  (*Id.* at 219.)  He complained of difficulty sleeping.  (*Id.*)  Osborne also

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, as this appeal focuses only on Osborne's mental impairments (Doc. No. 11 at 5), the Court limits its discussion to the medical evidence relevant to those impairments.

reported he often stayed at home by himself and had "no interest in going out or socializing," although he did "'occasionally' talk to friends on the phone." (*Id.* at 221.) Osborne told Dr. Koricke his wife died from cancer six months earlier, he attended regular classes in high school, and he last stopped working in October 2003 when he lost his job when the company he worked for closed. (*Id.* at 218-19.) Osborne's daily activities included helping with laundry when he could and cooking sometimes. (*Id.* at 221.) He reported he tried "to pace himself through household chores, but described difficulty completing tasks due to his health impairment and lack of motivation." (*Id.*) He watched television. (*Id.*) He reported drinking four to six beers "approximately three to four times per week." (*Id.* at 219.)

On examination, Dr. Koricke found Osborne understood the questions asked, "but had a difficult time maintaining his focus." (*Id.* at 220.) Osborne "demonstrated a good level of effort" and cooperated throughout the interview process. (*Id.*) However, Osborne's "eye contact was intermittent throughout the interview" and he was "difficult to engage," "clearly sad and withdrawn," and "clearly struggling with depression." (*Id.*) Osborne "presented as very solemn and despondent with a blunted range of emotions." (*Id.*) Osborne also exhibited a good appearance, normal speech, and adequate insight and judgment. (*Id.* at 219-20.) While Osborne's thought process was logical and coherent, he demonstrated "difficulty maintaining his focus on the conversation and would lose his train of thought when speaking at times." (*Id.* at 220.) Osborne "demonstrated a flat and blunted affect" and "appeared sluggish, withdrawn, and depressed." (*Id.*) Dr. Koricke opined Osborne's "difficulty concentrating and maintaining his focus during the interview" was "secondary to his depressive disorder rather than an overall cognitive deficit." (*Id.*)

Dr. Koricke concluded Osborne suffered "from a major depressive disorder of moderate severity." (*Id.* at 221.) Dr. Koricke opined, "It is highly probable that the stresses and pressures of daily work would exacerbate the acuity of his symptoms, worsening his moderate symptoms to a more severe major

depression." (*Id.*) Dr. Koricke further opined Osborne's ability to relate to others, understand, remember, and follow instructions, maintain attention, concentration, persistence, and pace, and his ability to withstand the stress and pressures associated with day-to-day work activity were moderately impaired. (*Id.* at 221-22.) Dr. Koricke concluded Osborne "lacks the mental consistency required to adequately and regularly complete work-related tasks." (*Id.* at 222.)

On May 29, 2008, Osborne underwent a second consultative examination for the Agency with Thomas Zeck, Ph.D. (*Id.* at 299-305.) Osborne reported he was depressed and had trouble remembering things. (*Id.* at 299.) He also reported "a terrible sleep pattern," "frequent nightmares," feeling helpless, hopeless, and worthless, and crying spells at least once a day. (*Id.* at 301.) Osborne told Dr. Zeck he stayed with his girlfriend "quite frequently" and helped her with household chores, including caring for the cats and doing laundry. (*Id.* at 301-02.) Osborne cooked occasionally and cleaned up after himself. (*Id.* at 302.) He enjoyed drawing and had friends and acquaintances, although he did not have much contact with them. (*Id.*)

On examination, Dr. Zeck found Osborne "quite verbal and participatory but exhibited a flat affect and seemed to be depressed without a great deal of enthusiasm or animation." (*Id.* at 301.) Osborne's "speech was generally relevant and coherent" and Dr. Zeck saw "no motor or autonomic signs of anxiety." (*Id.*) Osborne counted backwards from 20 to one, performed serial sevens and threes "quite well," recalled two out of three items after five minutes, and interpreted one out of three proverbs. (*Id.* at 302.) Dr. Zeck determined Osborne's "concentration, rote memory, and immediate recall as measured by digits forward and backwards was [sic] within the average range." (*Id.*) His responses to hypothetical judgment situations placed his judgment in the low average range. (*Id.*) His abilities to think abstractly and think logically were also in the low average range. (*Id.*) Intellectual testing showed a verbal IQ of 90, a performance IQ of 84, and a full-scale IQ of 87. (*Id.*) Osborne exhibited a good attitude, "he put forth a

good effort on the WAIS-III," and he was "quite attentive to the tasks." (*Id.* at 303.) Dr. Zeck determined Osborne's composite score on the Weschler Memory test "would place him two and a half standard deviations below the mean" and noted Osborne seemed "rather unsure of his responses." (*Id.*)

Dr. Zeck opined Osborne appeared depressed but did not appear anxious and "no psychotic processes were noted." (*Id.*) However, his behavior during the interview was "somewhat strange and 'weird'" at times. (*Id.*) Dr. Zeck diagnosed Osborne with depressive neurosis, not otherwise specified. (*Id.* at 304.)

Dr. Zeck opined Osborne's ability to relate to coworkers and supervisors and withstand the pressures of the day to day work activity were moderately impaired. (*Id.*) Osborne's ability to understand, remember, and follow instructions was equivocal; "[o]n the one hand he did quite well and we did not have to repeat questions to him but on the other hand he had difficulty with memory." (*Id.* at 304.) Osborne had reported he had "memory problems and always needs to make a list of things that he has to do." (*Id.*) Dr. Zeck further opined Osborne's ability to maintain concentration, persistence, and pace to perform simple, repetitive tasks "may be mildly impaired" and noted an "inconsistency" in Osborne's performance. (*Id.*) Dr. Zeck noted this inconsistency "makes it difficult to determine his ability to perform work." (*Id.* at 305.)

On August 25, 2009, Osborne saw Diana Adams, LSW, for his "severe anxiety attacks and depression" upon the referral of his neurologist, Dr. Patel. (*Id.* at 430.) Osborne reported experiencing nightmares almost every night, either of his wife dying or not being able to do anything right. (*Id.*) During the day, Osborne had flashbacks and felt like he was reliving a situation. (*Id.*) Osborne also complained of anxiety attacks, including feeling shaky, rapid breathing, increased heartrate, and chest pain. (*Id.*) When he was depressed, Osborne felt hopeless and that nothing was going to get better. (*Id.*) He also experienced lack of motivation and anhedonia. (*Id.*) Osborne reported having suicidal thoughts

when his wife died in 2006, but stated he never had a plan. (*Id.*) Sometimes, when his stress and anxiety was high, Osborne was unable to leave his house. (*Id.* at 431.) In addition, when he was anxious, he was unable to eat. (*Id.* at 435.) Osborne told Adams his anxiety, depression, racing thoughts, and flashbacks were interfering with his life. (*Id.* at 436.) Osborne also told Adams he had a girlfriend he had been seeing since January of 2009 and that things were going well; his girlfriend was his "best friend." (*Id.* at 431.) Osborne also reported a past history of drug and alcohol abuse and admitted to having drank that morning before his appointment. (*Id.* at 438.) However, Osborne felt his drinking was under control. (*Id.*)

On examination, Adams found Osborne "presented with a stable mood, but at times seemed anxious." (*Id.*) His eye contact was fair, and his insight was good. (*Id.*) Osborne exhibited a normal appearance, clear speech, a logical thought process, full affect, cooperative behavior, and good insight. (*Id.* at 441.) However, Osborne's "[t]houghts were racing, [his] memory [was] poor," and he had "trouble concentrating due to his racing thoughts and flashbacks." (*Id.* at 438.) Adams diagnosed Osborne with post-traumatic stress disorder ("PTSD") and depression, not otherwise specified. (*Id.*) Adams recommended individual counseling on an outpatient basis and AA meetings. (*Id.* at 437.) Osborne missed his scheduled counseling session in September 2009. (*Id.* at 447.) Records from November 2009 reflect communication in November 2009 concerning rescheduling a counseling session, but it appears Osborne failed to schedule any additional sessions. (*Id.* at 444-46.)

On March 15, 2010, Osborne saw Thomas Williams, M.A., LPCC. (*Id.* at 478.) Osborne complained of panic attacks, nightmares, rapid heartbeat, muscle tightness, and being on edge. (*Id.*) Osborne told Williams he tends to isolate himself because he has no patience with people, he "[e]asily lashes out whenever he is upset," and he "[b]ecomes agitated easily." (*Id.*) Williams noted Osborne "[s]truggles to focus and pay attention" and his memory was impaired. (*Id.*) On examination, Williams

found Osborne exhibited normal dress and hygiene, was oriented times three, had intact recent and remote memory, normal motor behavior, and fair insight and judgment. (*Id.* at 480.) Osborne also exhibited an anxious and depressed mood, a logical but pressured thought process, and pressured speech. (*Id.*) Osborne reported occasional suicidal ideation but no plan. (*Id.*)

On April 12, 2010, Osborne saw Williams for a counseling session, and the two spent the session discussing the physical abuse Osborne had experience as a child. (*Id.* at 477.)

Also on April 12, 2010, Osborne saw Byong Ahn, M.D., for the first time. (*Id.* at 670.) That same day, Dr. Ahn completed a Mental Functional Capacity Assessment. (*Id.*) Dr. Ahn opined Osborne was not significantly limited in his ability to carry out short and simple instructions but was moderately limited in his ability to understand and remember very short and simple instructions. (*Id.*) Dr. Ahn opined Osborne's ability to complete a normal workday and workweek and perform at a consistent pace was also moderately limited. (*Id.*) Dr. Ahn further opined Osborne was markedly limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others, interact appropriately with the general public, get along with coworkers or peers, and respond appropriately to changes in the work setting. (*Id.*)

Dr. Ahn supported his findings by explaining that on examination, Osborne exhibited a depressed and anxious mood and appeared hypervigilant. (*Id.* at 671.) Osborne was "frustrated and angry when discussing his medical problems and seemed to become easily pressured." (*Id.*) Dr. Ahn noted Osborne's memory, especially his short-term memory, was impaired, and he needed to write lists to remember things. (*Id.*) Dr. Ahn also noted Osborne became anxious around people and had panic attacks when he left the house. (*Id.*) He isolated himself at home because he had no patience with people. (*Id.*) Osborne complained of poor sleep and appetite, felt hopeless and worthless, could not focus, had suicidal ideation

with no plan, and was sad and tearful. (*Id.*) He also experienced flashbacks from an abusive childhood. (*Id.*) Osborne's cognitive functioning was intact for the most part. (*Id.*) Medication was pending. (*Id.* at 672.)

On May 24, 2010, Osborne saw Williams for a counseling session. (*Id.* at 476.) Osborne told Williams he was still dealing with some anxiety and poor sleep, but talking had decreased the amount of his flashbacks. (*Id.*) Williams diagnosed Osborne with generalized anxiety disorder and major depression, with a rule out diagnosis of bipolar disorder. (*Id.* at 475.) Williams identified Osborne's first problem as a high anxiety state, and his second problem as a depressed mood. (*Id.*) Williams recommended individual counseling twice a month and medication management. (*Id.*)

On June 7, 2010, Osborne saw Williams for another counseling session. (*Id.* at 474.) Osborne reported he was "[d]oing better [with] his moods and feels his anxiety levels are down." (*Id.*)

On June 25, 2010, Osborne saw Dr. Ahn. (*Id.* at 466.) Osborne told Dr. Ahn he had struggled with anxiety for most of his life. (*Id.*) Osborne reported his anxiety symptoms included rapid heartbeat and feeling nervous, shaky, and overwhelmed. (*Id.*) Osborne also reported having low self-esteem and feeling down and depressed, with little sleep. (*Id.*) Osborne told Dr. Ahn he had problems dealing with people and tended to stay home and isolate himself because he felt people were staring and laughing at him. (*Id.*) Osborne also reported nightmares relating to physical abuse he had suffered as a child. (*Id.*) Osborne also claimed to have anger problems at times. (*Id.* at 467.) He slept poorly, with nightmares and early morning waking. (*Id.*) Dr. Ahn also noted mild paranoid ideations. (*Id.*)

On examination, Dr. Ahn found Osborne looked tense and nervous and had the tendency to show some pressured speech. (*Id.*) Dr. Ahn noted Osborne's speech was generally coherent and he exhibited no impaired cognitive function at that time. (*Id.*) While Osborne claimed to feel panic, Dr. Ahn found it did not appear to be panic. (*Id.*) However, Osborne did have "anxiety-like symptoms." (*Id.*) Dr. Ahn

noted Osborne's "affect was a little tense and nervous." (*Id.*) Dr. Ahn diagnosed Osborne with generalized anxiety disorder and major depression, with rule-out diagnoses of panic disorder and bipolar affective disorder. (*Id.*) Dr. Ahn prescribed Paxil and Xanax. (*Id.* at 468.)

That same day, Osborne also had a counseling session with Williams. (*Id.* at 473.) Williams noted Osborne remained withdrawn. (*Id.*)

On July 19, 2010, Osborne saw both Williams and Dr. Ahn. (*Id.* at 465, 472.) Osborne had bought the Paxil and Xanax but did not take the Paxil because he was afraid of the side effects. (*Id.* at 472.) Osborne told Williams he had taken the Xanax and found it effective in "calming" his anxiety. (*Id.*) Dr. Ahn prescribed Lexapro instead of Paxil and again prescribed Xanax. (*Id.* at 465.) Osborne reported he had gone to the zoo and "gotten out a little more." (*Id.* at 472.)

On August 16, 2010, Osborne again saw both Williams and Dr. Ahn. (*Id.* at 464, 471.) Osborne told Williams he had had a good couple of weeks. (*Id.* at 471.) He had spent a week at his girlfriend's family's home in West Virginia, and he "dealt [with] the changes w/o any problems." (*Id.*) Osborne told Dr. Ahn he had noticed "some improvement in his anxiety," and had been able to sleep better. (*Id.* at 464.) Dr. Ahn continued both Lexapro and Xanax, but increased Osborne's dosage of Xanax. (*Id.*)

On August 20, 2010, Dr. Ahn completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. (*Id.* at 459-60.) Dr. Ahn opined Osborne was moderately limited in his ability to remember, understand, and follow simple directions, and markedly limited in his ability to maintain attention and concentration for two-hour periods of time. (*Id.* at 459.) Dr. Ahn further opined Osborne was markedly limited in his ability to perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, interact appropriately with others, and make simple work-related decisions. (*Id.* at 459-60.)

Dr. Ahn supported his opinions by explaining Osborne worried and was anxious about multiple stressors in his life and tended to obsess over them; these thoughts distracted from his ability to focus. (*Id.* at 459.) Osborne's pace often depended on his mood and stress levels; he had panic attacks when stressed, which would interfere with his work pace. (*Id.*) His attendance would depend on his current state of agitation and paranoia. (*Id.*) Osborne got very anxious around people and experienced frequent panic attacks when he left his house. (*Id.*) He also had no patience with people. (*Id.*) Osborne tended to second-guess most of his decisions. (*Id.* at 460.) While Dr. Ahn did not opine as to the level of impairment in Osborne's ability to withstand the stresses and pressures of routine, simple, unskilled work, Dr. Ahn noted small things aggravated and upset Osborne, and he reacted with anxiety, irritability, and agitation. (*Id.*) Dr. Ahn determined Osborne had the ability and capability to do unskilled/skilled jobs, but psychological disorders prohibited adequate functioning at that time. (*Id.*) Dr. Ahn also noted Osborne had had this problem for several years. (*Id.*) Dr. Ahn opined Osborne's memory was impaired due to his preoccupations, and he constantly made lists and notes to remember what he was supposed to do. (*Id.*)

On August 30, 2010, Osborne saw Williams for another counseling session. (*Id.* at 470.) Williams noted Osborne left his house infrequently as he was too nervous to go out. (*Id.*)

On October 11, 2010, Osborne saw Dr. Ahn for a follow-up appointment. (*Id.* at 703.) Osborne reported his mood had been "okay" and while his anxiety had improved, "he still ha[d] some remnants of his anxiety." (*Id.*) Osborne also reported a continued inability to sleep at times. (*Id.*) Dr. Ahn continued Osborne's medications. (*Id.*)

On January 7, 2011, Osborne again saw Dr. Ahn for a follow-up appointment. (*Id.* at 702.) Osborne reported increased anxiety and depression over the holidays but was feeling better now that the holidays were over. (*Id.*) Dr. Ahn noted Osborne still had some anxiety symptoms and "panic-like

symptoms." (*Id.*) However, Osborne's medications appeared "to be working okay for him," and Dr. Ahn continued Osborne's medications. (*Id.*)

On February 28, 2011, Osborne saw Dr. Ahn for another follow-up appointment. (*Id.* at 701.) Dr. Ahn noted Osborne had called a week before complaining of increased nightmares and bad dreams. (*Id.*) Dr. Ahn had told him to take more Xanax. (*Id.*) Osborne reported his brother was staying at his mother's house and Osborne was "afraid he will do something bad to them such as assaulting his mother." (*Id.*) Osborne also reported he had gone for a stress test because of chest pain but the doctors believed his chest pain could have been caused by his anxiety. (*Id.*) Dr. Ahn ordered Klonopin and advised Osborne to take his medications and take it easy. (*Id.*)

On March 28, 2011, Osborne again saw Dr. Ahn for a follow-up appointment and reported the Klonopin helped him have fewer nightmares. (*Id.* at 700.) Dr. Ahn continued Osborne's medications. (*Id.*)

That same day, Dr. Ahn completed a Mental Functional Capacity Assessment. (*Id.* at 704.) While Dr. Ahn opined Osborne had no significant limitation in his ability to carry out short and simple instructions, Osborne was moderately limited in his ability to understand and remember simple and detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek, perform at a consistent pace, and interact appropriately with the general public. (*Id.*) Dr. Ahn further opined Osborne was markedly limited in the ability to carry out detailed instructions, get along with coworkers or peers, and respond appropriately to changes in the work setting. (*Id.*) Dr. Ahn supported his findings by explaining Osborne had been diagnosed with anxiety and mood problems. (*Id.* at 706.) Osborne's elevated anxiety levels led to panic attacks. (*Id.*) Osborne found it difficult to be in public places because he was nervous around people, and "those situations have led to panic attacks." (*Id.*) Osborne also experienced flashbacks to an abusive childhood. (*Id.*)

On May 9, 2011, Dr. Ahn completed a questionnaire for the Social Security Agency regarding Osborne's mental impairments.  (*Id.* at 711-13.)  Dr. Ahn reported Osborne had "a history of significant anxiety disorders that include panic disorder."  (*Id.* at 712.)  Osborne avoided leaving the house because being around people made his anxiety worse.  (*Id.*)  He also had persistent nightmares and depression.  (*Id.*)  Osborne's nervousness impaired his focus, as his mind wandered and raced, and he was easily confused at times.  (*Id.*)  Osborne was mildly paranoid in public, and felt that people were staring at him, judging him, watching him, and laughing at him.  (*Id.*)  He had very low self-esteem that also made it difficult for him to be around people.  (*Id.*)  Being in new situations and public situations triggered anxiety episodes; while medications helped reduce their severity, Osborne still experienced these episodes daily.  (*Id.*)  Despite Osborne's "100%" compliance with medications and appointments, his symptoms had a limited response to treatment.  (*Id.* at 713.)  Dr. Ahn opined Osborne did not tolerate change or stress well and they increased his anxiety.  (*Id.*)  Dr. Ahn reported Osborne's diagnoses were generalized anxiety disorder, major depression, recurrent, and panic disorder.  (*Id.*)

## C.    State Agency Reports

On June 17, 2008, state agency reviewer Aracelis Rivera, Psy.D., opined Osborne was not significantly limited in his ability to maintain concentration and attention for extended periods, but was moderately limited in his ability to understand, remember, and carry out detailed instructions, interact appropriately with the general public, ask simple questions and request assistance, accept instructions and criticism from supervisors, and respond appropriately to changes in the work place.  (*Id.* at 306-08.)  Dr. Rivera determined, "The data suggest that the claimant does have some limitations however significant functional capacity still remains.  Working with the public may be anxiety provoking but the claimant can interact on a superficial basis.  He can comprehend, remember, and carry out simple task instructions." (*Id.* at 308.)

On December 2, 2008, state agency reviewer Todd Finnerty, Psy.D., affirmed the initial assessment. (*Id.* at 374.)

## D. Hearing Testimony

During the April 3, 2018 hearing, Osborne testified to the following:

- He has a difficult time. Sometimes just being around anyone causes panic attacks. He has a lot of anxiety problems and there are days when he cannot even leave the house. He is fearful of public situations, and that keeps him inside his house. Both the presence of other people and being away from the familiar surroundings of his house make him fearful. (Tr. 775-76.)

- He used to be a somewhat social person; he had friends and he did things. But he cannot interact with people anymore. It has been about fifteen years, or since the early to mid-2000s, since he was a social person who did things. (*Id.* at 776.)

- The level of functioning he had from 2006 to 2011 is the same as the previous five years. In describing his current problems, they are very similar to the problems he had then. (*Id.* at 776-77.)

- The only time he left the house between 2006 and 2011 was to attend doctors' appointments or to get food. (*Id.* at 777.)

- His mental health problems affect his ability to pay attention and concentrate on things. He could be talking to someone and it is like he goes somewhere else or mentally he is drifting away. He watches television and it is like he is not taking any of it in. He has to go back and rewind it. Even though he is looking right at the television, it is like the information is not sinking in. He gets partially through a show or movie and has no idea what just happened. He also has a hard time reading. When he gets to the end of a paragraph or page, he has no idea what he read and must go back and reread it. (*Id.* at 777-79.)

- He also has a difficult time completing activities. He will start something and then ends up walking away and doing something else. He finds he has started many different projects but all of them are unfinished. (*Id.* at 779-80.)

- He has panic attacks. He feels like everything is really heavy around him and everything is coming down on him. It feels like he is going to die. These episodes started when his wife was sick and got worse after she died. They happened all the time during the 2006 to 2011 timeframe, often many times a day. It could take hours or even days for him to feel like he had before the panic attack started. He goes through periods of depression and panic, and he cannot sleep. When he does start to feel better, he feels dread because he knows it will happen again. (*Id.* at 781-83.)

The ALJ told the VE Osborne had past work as a CNC operator, but that work was too far in the past to be considered past relevant work. (*Id.* at 785.) The ALJ then posed the following hypothetical question:

> [I]f you would consider a person of the claimant's age, education, and without past relevant work, with no exertional limitations, but who has the ability to perform work that does not require using ladders, ropes, or scaffolds, who is able to perform work that does not involved [sic] exposure to hazards such as industrial machinery, unprotected heights, or commercial driving, who has the capacity to perform simple, routine, low-stress tasks that are not performed in a fast-paced production work environment, the capacity to concentrate and persist sufficiently to complete simple routine low-stress tasks, the capacity for superficial interaction with supervisors, coworkers, and the public, and superficial as being defined as not requiring arbitration, negotiation, confrontation, or directing the work of others, or being responsible for the safety of others; would you know of jobs that person could perform?

(*Id.* at 785-86.)

After clarifying what the ALJ meant by fast-paced production quota and low stress, the VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner II, cafeteria attendant, and folder, clothing. (*Id.* at 786-87.)

Osborne's attorney asked if the limitation for supervision was changed from superficial to superficial and occasional, whether the representative jobs identified would still be available. (*Id.* at 788.) The VE testified the three representative jobs would still be available. (*Id.*) Osborne's attorney then asked whether the VE's testimony would be affected if the hypothetical individual would need to have reminders four to six times a day by supervisors or coworkers. (*Id.*) The VE testified such a hypothetical individual would be unable to maintain any employment. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment

does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Osborne was insured on his alleged disability onset date, April 30, 2003, and remained insured through December 31, 2008, his date last insured ("DLI.")  (Tr. 737.)  Therefore, in order to be entitled to POD and DIB, Osborne must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant, William F. Osborne, was insured for a period of disability and disability insurance benefits on April 30, 2003, the date he has alleged he became disabled on, and he remained insured for these benefits through December 31, 2008.

2.    The claimant did not engage in substantial gainful activity between the April 30, 2003 alleged onset date and March 27, 2011, the day before the date he filed the above-mentioned, subsequent application for supplemental security income that Judge Kleber approved on March 28, 2011 (hereafter "the eight-year period at issue") (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant had the following severe impairments during the eight-year period at issue: a seizure disorder, a major depressive disorder, and a generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant did not have an impairment or combination of impairments during the eight-year period at issue that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    The claimant was not limited exertionally during the eight-year period at issue. However, he could not use ladders, ropes, or scaffolds because of his seizure disorder.  He also could not work in jobs where he would be exposed to hazards such as industrial machinery and unprotected heights.  He also could not operate motor vehicles for commercial purposes.  Subject to these non-exertional limitations, the claimant could concentrate and persist sufficiently so as to be able to perform simple, routine, low stress tasks as long as he did not have to work at a

fast-pace, and as long as he did not have to have more than superficial interactions with supervisors, co-workers, or members of the public. By superficial, the undersigned means work that would not have required him to engage in arbitration or negotiations, or confront others, or direct the work of others, or be responsible for the safety of others.

6. The claimant was not able to perform any of his past relevant work during the eight-year period at issue (20 CFR 404.1565 and 416.965).

7. The claimant was a younger individual in the "18 to 44" age group during the eight-year period at issue, that is between April 30, 2003 and March 27, 2011 (20 CFR 404.1563 and 416.963).

8. The claimant, who has a limited education, was able to communicate in English during the eight-year period at issue (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed during the eight-year period at issue, that is between April 30, 2003 and March 27, 2011 (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant, William F. Osborne, was not under a disability, as defined in the Social Security Act, at any time during the eight-year period at issue. More specifically, between April 30, 2003, the date he has alleged he became disabled on, and March 27, 2011, the day before the date he protectively filed the above-mentioned supplemental security income application Judge Kleber approved on January 4, 2013 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 739-59.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

The heart of Osborne's RFC argument is the ALJ "cherry-picked" the record to support her RFC findings that Osborne could perform simple, routine, low stress tasks but no fast-paced work and could have superficial interaction with supervisors, coworkers, and members of the public (defined as not engaging in arbitration or negotiations, confronting others, directing the work of others, or being responsible for others). (Doc. No. 11 at 17.) Osborne asserts, "The ALJ later recites 'facts' upon which she 'placed great weight' in reaching her RFC finding . . . However, in her efforts to show that her explanation of moderate limitations in concentration, persistence, and pace was sufficient, the ALJ cites almost exclusively to normal findings," ignoring the "multiple abnormal findings in the record." (*Id.*) Indeed, as Osborne makes clear in his reply brief, "That the ALJ relied on some evidence and ignored other evidence is the primary issue in this matter." (Doc. No. 14 at 1.)

The Commissioner argues substantial evidence supports the ALJ's RFC. (Doc. No 13 at 11.) The Commissioner asserts, "[T]he ALJ went to great lengths to explain, consistent with Judge Gwin's direction, why no additional restriction was necessary than the limitation to simple, routine, low stress tasks; no fast-paced work; and only superficial interactions with others." (*Id.* at 10-11.) The

Commissioner insists the Court must "decline Plaintiff's implicit invitation to reweigh the evidence." (*Id.* at 12.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§§ 404.1527(d)(2), 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§§ 404.1527(d)(3), 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing

*Thacker v. Comm'r*, 99 F. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In her RFC analysis, the ALJ found evidence Osborne stopped working in 2003 because he was laid off and not because he was disabled, as well as the fact that he said he was not working because he could possibly have a seizure at work despite evidence showing the efficacy of Osborne's anti-seizure medications, detracted from finding that Osborne was disabled between April 30, 2003 and March 27, 2011. (Tr. 750.) In determining Osborne's RFC during the eight-year period at issue, the ALJ "also placed great weight on the following additional facts":

- The claimant did not receive any medical treatment in 2003 aside for follow-up treatment related to seizures he had in May 2003 that were thought to be related to the claimant's withdrawing from alcohol.

- Dr. Patel, the above-mentioned treating neurologist, described the claimant on August 12, 2004 as being cognitively intact (see Ex. 21F, p. 23). Dr. Patel also said his examination of the claimant on August 12, 2004 was "unremarkable." (*Id.*). Dr. Patel also described the claimant on August 12, 2004 as having an appropriate mood and affect, a normal gait, and normal coordination. (*Id.*).

- The claimant was described on July 23, 2004, the first time he met with a mental health counselor, as being alert and cooperative (see Ex. 28F, p. 3).

- The claimant was described at a second meeting with a mental health counselor on August 6, 2004 as being alert and cooperative (see Ex. 28F, p. 2).

- The claimant's mental health chart was closed on November 10, 2004 because he had not gone to any scheduled counseling appointments after August 6, 2004 (see Ex. 28F, p. 1).

- There is no evidence the claimant received any medical treatment during the 18-month period between August 7, 2004 and February 25, 2006. [As she previously noted, the undersigned presumes that, during such periods, the claimant was able to obtain and take anti-seizure medications that he started taking after he was hospitalized in May 2003 because of seizures thought to have been caused by the claimant withdrawing from alcohol.].

- The claimant went to a hospital on February 26, 2006 complaining that he had had a seizure because he was not able to take his anti-seizure medication (see Ex. 9F, p. 10). The claimant was described on that date as having normal strength and sensation. (*Id.*).

- The claimant told Dr. Patel on May 1, 2006 that he drank five to six cans of beer five times a week (see Ex. 22F, p. 14). Dr. Patel described the claimant on that date as being alert and properly oriented, and as having normal strength and a normal gait. (*Id.*).

- The claimant was described on August 20, 2006 as being independent in terms of being able to carry out activities of daily living (see Ex. 21F, p. 5). The claimant was also described on that date as being cooperative, and as having an appropriate mood, and as having a normal gait and normal coordination. (*Id.*).

- The claimant described himself on December 29, 2006 as having between three and six beers a day (see Ex. 6F, p. 12). The claimant was also described on December 29, 2006 as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 6F, p. 13).

- The claimant received little medical treatment in 2007. However, as noted above, Dr. Koricke evaluated him on May 28, 2007 at the request of the Commissioner in response to prior applications for a period of disability, disability insurance benefits, and supplemental security income that the claimant filed on December 20, 2006. Among other things, Dr. Koricke described the claimant on May 28, 2007 as having a normal gait (see Ex. 3F, p. 4). Dr. Koricke also said the claimant's "clothes were clean and appropriate and his hygiene was good." (*Id.*). Dr. Koricke also said the claimant was cooperative, alert, and properly oriented but that he did have some problems maintaining his attention (see Ex. 3F, pps. 4 and 5).

- On August 28, 2007, one of the few times the claimant was seen by a private medical professional in 2007, he was described as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 6F, p. 10). The claimant also acknowledged on August 28, 2007 that he was stilling drinking alcohol. (*Id.*).

- The claimant was described on February 4, 2008 as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 6F, p. 8).

- As noted above in the discussion beneath Finding 3, the claimant was able to interact adequately with the above-mentioned claims representative who interviewed him on March 31, 2008 (see Ex. 1E, p. 3). This source also described the claimant as being coherent and not having any problems understanding or answering questions, or any problems concentrating. (*Id.*). This source also described the claimant as not having any problems hearing, reading, breathing, talking, sitting, standing, walking, seeing, writing, or using his hands. (*Id.*)

- As noted above in the discussion beneath Finding 3, the claimant told a different claims representative on April 9, 2008 he did not "have any problems with people" (see Ex. 3E, p. 2).

- As noted above in the discussion beneath Finding 3, the claimant told Dr. Zeck on May 29, 2008 at the request of the Commissioner that he was in a relationship, and that he stayed with his girlfriend "quite frequently" (see Ex. 11F, p. 4). [The claimant also told a social

worker on August 25, 2009 that his relationship with his girlfriend as "very good" (see Ex. 23F, p. 2).].

- The claimant was described on May 5, 2008 as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 15F, p. 19). The claimant also described himself on May 5, 2008 as drinking five to six cans of beer five times a week (see Ex. 15F, p. 18).

- Dr. Zeck described the claimant on May 29, 2008 as relating well to him (see Ex. 1lF, p. 7).

- The claimant told a consulting neurologist on July 11, 2008 that he was drinking alcohol every day (see Ex. 16F, p. 4). This source also described the claimant on this date as having alcohol-withdrawal-related seizures (see Ex. 16F, pps. 4, 5, and 7). This source also described the claimant as being alert, pleasant, and cooperative, and as having a normal gait and normal coordination (see Ex. 16F, pps. 4 and 6). (*Id.*).

- The claimant was described on August 6, 2008 as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 22F, p. 3).

- The claimant was described on April 17, 2009 as being alert and properly oriented, and as having normal strength and a normal gait (see Ex. 22F, p. 9).

- The claimant was described by the above-mentioned social worker who evaluated him on August 25, 2009 as having a global assessment of functioning ("GAF") score of 60 (see Ex. 23F, p. 11). This source also described the claimant as being alert and properly oriented, and as being cooperative and having an appropriate affect (see Ex. 23F, p. 22). The claimant also told this source on August 25, 2009 that his medications were effective in preventing seizures (see Ex. 23F, p. 8). The claimant also told this source that he drank "a couple of beers" four to five times a week, and that he had drank alcohol in the morning before he went to his appointment with her (see Ex. 23F, p. 10; see also Ex. 23F, p. 14).

- The claimant was described on September 22, 2009 as having normal strength (see Ex. 23F, p. 19).

- The claimant was described on October 15, 2009 as being alert and as having normal strength and a normal gait (see Ex. 22F, p. 7).

- The claimant was described on February 16, 2010 as being alert and as having normal strength and a normal gait (see Ex. 22F, p. 4).

- Dr. Ahn described the claimant in June and August 2010 that that claimant's global assessment functioning score (GAF) over the last year was 60, which indicates moderate symptoms (Exhibits 25F; 26F, p.6).

In rejecting allegations that the claimant had a more restricted residual functional capacity during the eight-year period at issue, the undersigned has also placed great weight on the following previously noted facts:

- The claimant's medical records during the eight-year period at issue include few to no complaints about problems the claimant had understanding, remembering, or applying information.

- The claimant was able perform skilled work (see Finding 6 below) before he was laid off from work in 2003 (see Exs. 3F, p. 3; 11F, p. 4; 20F, p. 4; and 23F, p. 4).

- The claimant did not engage in mental health treatment during the seven-year period between the April 30, 2003 alleged onset date and March 14, 2010 suggests his mental functioning during that period was not as bad as he and others have alleged.

- The claimant was not psychiatrically hospitalized at any time between April 30, 2003 and March 27, 2011.

- There is no evidence the claimant had any significant problems interacting with medical professionals, or others, between April 30, 2003 and March 27, 2011.

- There is no evidence the claimant's mental functioning was so poor at any time between April 30, 2003 and March 27, 2011 that it attracted the attention of civil or criminal authorities.

- The claimant was described as being alert and/or properly oriented on most, if not all, of occasions he met with medical providers between April 30, 2003 and March 27, 2011.

- Dr. Zeck described the claimant on May 29, 2008 as being able to count backwards from 20 to 1, and being able to perform serial 3's and serial 7's (see Ex. 11F, p. 5). Dr. Zeck also said the claimant "was able to recall two out of three objects after five minutes," and that the claimant's "concentration, rote memory, and immediate recall" were within the average range. (*Id.*). Dr. Zeck also described the claimant as putting "for a good effort" during intelligence testing on May 29, 2008 (see Ex. 11F, p. 6). "He was quite attentive to the tasks," Dr. Zeck said. (*Id.*).

(*Id.* at 750-54.)

The Court finds that, at least through the date of the state agency reviewing source's opinion affirming the mental RFC findings determined on initial review, dated December 2, 2008, substantial evidence supports the ALJ's RFC findings. As the ALJ noted, Osborne received relatively little mental health treatment during the eight-year period at issue, which she found suggested his mental functioning was not as severe as he and others had alleged.[3] (*Id.* at 741, 743, 745, 753.) The ALJ concluded Dr. Koricke's consultative examination "was based on a snapshot of the claimant," she "did not have the benefit of considering evidence about the claimant's mental functioning over a longitudinal period," and her opinion conflicted with the opinions of the state agency reviewing sources. (*Id.* at 755.) Furthermore, the state agency reviewing sources, whose opinions were given great weight by the ALJ, had the benefit of the opinions of both consulting examiners (Drs. Koricke and Zeck) in finding Osborne was not disabled. (*Id.* at 306-08, 374.) The ALJ properly considered, weighed, and resolved the conflicts between the evidence through December 2, 2008, and this Court may not reweigh the evidence. Therefore, the ALJ's RFC findings through December 2, 2008 are AFFIRMED.

The ALJ's treatment of the record evidence after December 2, 2008, is another matter. Regarding the 2009 records from the Nord Center, the ALJ highlighted the normal or positive findings and omitted any discussion of the abnormal or negative findings. (*Id.* at 742-45, 752.) Likewise, the ALJ discussed the normal or positive findings in the mental health treatment records from March 2010 on, omitting any discussion of the abnormal or negative findings contained in those records. (*Id.* at 741-45, 753.) The Court finds the ALJ "cherry-picked" the record evidence after December 2, 2008. As discussed *supra*, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical

---

[3] In the RFC portion of her opinion, the ALJ incorrectly stated Osborne had not received any mental health treatment before March 2010. (Tr. 753.) However, at Step Two, the ALJ accurately stated Osborne had received little mental health treatment "during the majority of the eight-year period at issue." (*Id.* at 741, 743, 745.)

evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g., Johnson*, 2016 WL 7208783, at *4 ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."). The ALJ erred by discussing only the record evidence after December 2, 2008 that placed Osborne in a capable light, without acknowledging – let alone discussing or analyzing – the evidence that potentially supports a finding of disability. Therefore, the Court VACATES this portion of the ALJ's decision and REMANDS this case for further proceedings consistent with this opinion.

As this matter is being remanded for further proceedings concerning review and proper articulation of the record evidence after December 2, 2008, and in the interests of judicial economy, the Court will not address Osborne's remaining assignment of error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED IN PART AND REVERSED AND REMANDED IN PART for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

Date: April 6, 2020                                    *s/ Jonathan Greenberg*
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge